IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRANK DILWORTH o/b/o ROSLYN A. DILWORTH, ) ) ) | |
| Plaintiff, ) ) ) | Civ. No. 14-1423-SLR |
| v. ) ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, ) ) ) ) ) | |
| Defendant. ) | |

Gary C. Linarducci, Esquire, New Castle, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant

**MEMORANDUM OPINION**

Dated: February __1__, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Frank Dilworth ("plaintiff"), on behalf of his late-wife Roslyn A. Dilworth ("claimant"), appeals from a decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying claimant's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g)

Presently before the court are the parties' cross-motions for summary judgment. (D.I. 8, 10) Plaintiff asks the court to reverse the Commissioner's decision and order benefits or remand for further proceedings. (D.I. 9 at 13) The Commissioner opposes this motion and requests that the court affirm her decision. (D.I. 11 at 15) For the reasons set forth below, plaintiff's motion for summary judgment will be granted and the Commissioner's motion for summary judgment will be denied.

## II. BACKGROUND

### A. Procedural History

Claimant filed a claim for DIB on July 19, 2012, alleging disability beginning May 1, 2007. (Tr. 15) The claim was denied at the initial level review on August 31, 2012.[1] (Tr. 15) After a hearing before an administrative law judge ("ALJ") was requested, claimant passed away from developments related to cancer. (Tr. 29) Her widower,

---

[1] This case was randomly selected by the agency to test modifications to the disability determination process, including the elimination of the request for reconsideration review at the state agency level. (D.I. 11 at 1 n. 1)

plaintiff, filed a substitution of party upon death of claimant. (Tr. 115) The hearing before the ALJ was held on November 1, 2013, where plaintiff and a vocational expert ("VE") testified. (Tr. 24-54)

On January 18, 2014, the ALJ issued an unfavorable decision, finding claimant was not disabled on or before March 31, 2010. (Tr. 12-21) The Appeals Council denied review. (Tr. 1-5) Having exhausted his administrative remedies, plaintiff filed a civil action on November 21, 2014, seeking review of the final decision. (D.I.1)

**B.     Medical History**

Claimant was born on February 27, 1962. (Tr. 123) She was 48 years old on March 31, 2010, her date last insured. (Tr. 56) She alleged disability due to epilepsy, Guillian-Barre Syndrome, and high blood pressure. (Tr. 188) Because this appeal is based primarily on the evidence regarding epilepsy, only those facts from claimant's medical history will be recounted.

Claimant had seizures beginning at age two or three after a bout of scarlet fever. (Tr. 380) Given the increased frequency of the seizures, she underwent a right temporal lobectomy in 1996. (*Id.*) For about a year after the surgery, she was seizure free. (*Id.*) But then her seizures returned as nocturnal events. Treatment records from Dr. Craig Wynne indicate that as of August 5, 2008, claimant was having one or two generalized tonic-clonic seizures a month. (Tr. 940) Treatment records from Thomas Jefferson University Neurology indicated that as of January 6, 2009, she was having one to two seizures per month. (Tr. 396) On April 21, 2009, claimant reported having between 2 and 3.5 seizures per month. (Tr. 951) In January 2008 and June 2009, she had abnormal EEGs. (Tr. 394, 388)

2

Claimant's treating neurologist, Sarah Schmitt, M.D., noted on June 16, 2010 that the seizures had been happening about twice a month. (Tr. 402) The treatment notes stated that the seizures lasted thirty seconds to one and one-half minutes. (*Id.*) The symptoms included eyes opening, left eye twitching, kicking, jerking movements, tongue biting, but no incontinence. She may have a headache in the morning after waking up. The use of the medication Trileptal reduced her postictal symptoms, but did not significantly change her seizure frequency. (Tr. 403) Claimant was informed of: (1) the risks associated with nocturnal seizures, including sudden unexplained death in epilepsy; (2) alternative antiepileptic medications; and (3) the possibility of surgery to reduce her nocturnal seizures. (Tr. 407)

As of March 13, 2011, claimant was unable to find work. She worked briefly in 2010 but had to leave because she was making too many mental errors. (Tr. 345) She was told she was too slow. (Tr. 905)

On August 8, 2011, claimant underwent a neuropsychological evaluation on referral by Dr. Schmitt for her seizures and cognitive complaints. (Tr. 905-910) The evaluation was performed by Kathy Lawler, D.Phil, ABPP, a board-certified neuropsychologist in the Department of Neurology at the Hospital of the University of Pennsylvania. (*Id.*) During the neuropsychological tests, claimant was "very cooperative" and "persisted through all tasks and put forth adequate motivation." (Tr. 907) Furthermore, she passed a formal embedded validity measure with 100% accuracy (CVLT-II, Forced Choice). (*Id.*) Therefore, the results of the evaluation were considered "a valid estimate of her current functioning." (*Id.*)

3

Dr. Lawler concluded that claimant demonstrated executive dysfunction as the primary inefficiency across cognitive domains. This was consistent with her nocturnal and likely frontal lobe seizures. (Tr. 911) Given the results of the evaluation, Dr. Lawler "strongly recommended that [claimant] apply for disability, as her cognitive weaknesses would preclude her from gainful employment." (Id.) Dr. Lawler further recommended cognitive rehabilitation therapy and psychotherapy, as well as continued participation at church and other supportive activities. (Tr. 911-912)

### C. Medical Opinions

Dr. Schmitt completed a Medical Source Statement on March 29, 2013 in which she addressed claimant's functional abilities and limitations. (Tr. 474-78) The form instructed Dr. Schmitt to answer all questions regarding claimant's conditions and limitations as of March 31, 2010. (Tr. 474)

Dr. Schmitt reported that claimant suffered from localization related epilepsy which was intractable, as well as cognitive deficits of executive dysfunction, with nocturnal generalized seizures occurring two to three times per month, and lasting thirty to ninety seconds. (Tr. 474-78) Dr. Schmitt also reported postictal manifestations including irritability, severe headache, agitation, and nasal congestion, with such problems lasting for 24 hours after a seizure and interfering with daily activities. (Tr. 475-76) Her symptoms included memory problems and cognitive deficits. (Tr. 477) Dr. Schmitt further opined that claimant was compliant with her medications but still had seizures. (Tr. 476) Finally, Dr. Schmitt opined that claimant was capable of low stress jobs, but would be absent from work about three times a month due to her impairments. (Tr. 478)

4

### D. The Administrative Hearing

#### 1. Plaintiff's testimony

Plaintiff testified that he met and married claimant in 1999. (Tr. 33) She had worked for a number of years and left her last full time job in 2007 after the company lost its contract. (Tr. 33-34) Plaintiff indicated that claimant was depressed from 2008 through 2010 and wanted to apply for disability due to her seizures. (Tr. 34) According to plaintiff, claimant had seizures in her sleep. (Tr. 35) When she tried working again in 2010, she could not grasp menial tasks. (Tr. 35) Plaintiff testified that claimant's memory got worse and she was making mistakes on the job. (Tr. 39)

Once or twice a week, claimant had seizures at night that lasted one to two minutes and happened up to three times a night. (Tr. 36-37) Plaintiff testified that claimant's neurologist recommended that he let claimant sleep through the seizures. (Tr. 37) Daytime effects included not remembering plaintiff's name and her memory taking up to two to three hours to come back. (Tr. 38)

#### 2. Vocational expert's testimony

The VE testified that, based upon her review of the record and plaintiff's testimony, claimant had worked as an insurance clerk, patient transporter, security guard, and cashier. (Tr. 47-48) The work as an insurance clerk was described as sedentary, but light as actually performed, and semi-skilled with a special vocational preparation ("SVP") of 4. (Tr. 47) The work as a patient transporter was described as medium, but heavy as actually performed, and unskilled with an SVP of 2. (Tr. 48) The security guard was light work as described and performed, semi-skilled, and had an

SVP of 3. (*Id.*) Finally, the cashier work was light as described and performed, unskilled, and had an SVP of 2. (*Id.*)

The ALJ asked the VE a series of questions regarding whether a person with certain hypothetical limitations could perform claimant's past relevant work. The first set of limitations included: a person of claimant's same age, education, and work experience who had no exertional limitations, should not climb ladders, and should avoid unprotected heights and machinery. (*Id.*) The VE testified that the person could perform all of claimant's past relevant work, without exception. (Tr. 49)

The second set of limitations included everything in set one and added the following: less than occasional difficulty with short and long-term memory, meaning any difficulty with short and long-term memory would be less than one-third of the day. (Tr. 49-50) The VE responded that the limitations would not eliminate past work. (Tr. 50)

The third set of limitations included all of the limitations from sets one and two with the following additions: the individual would have an unscheduled break at least three times per day or be off task one-third of the time, and have difficulty with concentration, pacing, and persistence for two-hour periods throughout an eight-hour day, sufficient to maintain five days a week at eight hours for a 40-hour work week. (Tr. 50-51) The VE responded that those hypothetical limitations would "eliminate all past work ... primarily due to the amount of time off task and the ability for attention and concentration of less than two-hour segments." (Tr. 51) In addition, there would be no other jobs in the regional economy that the person could do. (*Id.*)

### E. The ALJ's Findings

The ALJ issued the following findings: claimant last met the insured status requirements of the Social Security Act on March 31, 2010. (Tr. 17) Claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 1, 2007 through her date last insured of March 31, 2010. (*Id.*) Through the date last insured, claimant had the following severe impairments: epilepsy and Guillain-Bane syndrome. (*Id.*)

Through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 17-18) Claimant's seizures did not meet the criteria of either listing 11.02 or listing 11.03, because she did not have convulsive epilepsy "occurring more frequently than once a month in spite of three months of prescribed treatment, nor did she have non-convulsive epilepsy occurring more frequently than once a week in spite of at least three months of prescribed treatment." (Tr. 18) The ALJ also stated that claimant's seizures were "not complex partial seizures as required by listing 11.02B." (Tr. 20)

Claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she should avoid unprotected heights and moving machinery, and she cannot climb ladders. (Tr. 18) In determining claimant's residual functional capacity, the ALJ stated that the treatment records gave no documented evidence that claimant's seizures caused cognitive deficits or memory loss before March 31, 2010. (Tr. 20) "The frequency of the seizures were noted to have been only once or twice a month prior to March 2010." (*Id.*) Claimant

also had no exertional limitations prior to March 31, 2010. Claimant's physical examination prior to March 31, 2010 was normal except for the nocturnal seizures. (*Id.*) Finally, claimant's treating neurologist Dr. Schmitt opined that she was capable of a low stress job. (*Id.*)

The ALJ concluded that through the date last insured, claimant was capable of performing past relevant work as a patient transporter and security guard. (*Id.*) This work did not require the performance of work-related activities precluded by claimant's residual functional capacity. (*Id.*) Finally, the ALJ found that claimant was not under a disability, as defined in the Social Security Act, at any time from May 1, 2007, the alleged onset date, through March 31, 2010, the date last insured. (Tr. 21)

## III. STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Where the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the

decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.  DISCUSSION

Plaintiff argues that the ALJ made four errors in finding claimant not disabled. First, the ALJ rejected without explanation the neurophysiological evaluation of claimant's neuropsychologist, Dr. Lawler. (D.I. 9 at 3-4) Second, the ALJ should have found claimant disabled, because she met the criteria of listing 11.02B. (*Id.* at 4-6) Third, the ALJ rejected without explanation the medical opinion of claimant's treating physician, Dr. Schmitt, when it should have been given controlling weight. (*Id.* at 6-10) Finally, plaintiff argues the ALJ's hypothetical questions posed to the VE failed to include all of claimant's credibly established limitations, because those questions did not include the limitations set forth in the medical opinions of Dr. Lawler or Dr. Schmitt. (*Id.* at 10-12) Each of these arguments are addressed in turn.

### A.  Dr. Lawler's Neuropsychological Evaluation

Plaintiff argues that, if the ALJ had properly credited the neuropsychological evaluation of claimant's neuropsychologist, Dr. Lawler, claimant would have been found disabled. (D.I. 9 at 3-4) Dr. Lawler concluded, after completing a neuropsychological evaluation on August 8, 2011, that claimant's "cognitive weaknesses would preclude her from gainful employment." (Tr. 905-910) The ALJ never mentioned Dr. Lawler's report

9

in her decision, and thus gave no indication whether she rejected it or why. (D.I. 9 at 3-4) The Commissioner claims that the ALJ is not required to consider evidence relating to the period after claimant's date last insured of March 31, 2010. (D.I. 11 at 6-8)

An ALJ "must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). The ALJ may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some indication of the reason for discounting the evidence she rejects. *Id.* "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir.1981)). Thus, the Third Circuit has reversed the decision of an ALJ where the ALJ failed to mention or explain contradictory medical evidence. *See Adorno*, 40 F.3d at 48.

Furthermore, an ALJ cannot necessarily ignore evidence from after a claimant's date of last insured. Diagnosis of an impairment after the date of last insured can support a finding of an earlier impairment date when corroborated by lay testimony and medical evidence describing a claimant's history and symptomatology. *Mendes v. Barnhart*, 105 F. App'x 347, 352 (3d Cir. 2004) (reversing denial of disability because evidence of an impairment documented in 1992 could support a finding that claimant was disabled before 1990); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (holding that the ALJ "failed properly to consider the non-contemporaneous evidence presented by [the claimant] in order to perform a retrospective analysis").

The Commissioner argues that Dr. Lawler's evaluation cannot relate back to the period on or before claimant's date of last insured, because it contains Dr. Lawler's statement that "the results of this evaluation are considered a valid estimate of [claimant's] **current** functioning." (D.I. 11 at 7 (citing Tr. 907 (emphasis in brief))) That single statement is not conclusive, however, because the evaluation also stated that the diagnoses could be linked back to claimant's "history of intractable seizures;" that "several weaknesses on testing ... can be understood as manifestations of executive dysfunction, consistent with her nocturnal seizures;" "[h]er early seizure onset increases the likelihood of skill organization, thereby resulting in what may have been a long-standing language-based weakness;" "[g]iven her history of right hemisphere surgery, there were expectable weaknesses with judgment of line orientation;" and "[t]here is also a strong possibility that she had pre-morbid language-based weaknesses given her early seizure activity and skill reorganization." (Tr. 905, 911) These statements suggest that the neurophysiological evaluation in 2011 may well have diagnosed an earlier impairment. Ultimately, the ALJ would have to determine if Dr. Lawler's diagnoses can relate back to an earlier impairment date.

Finally, the Commissioner relies on *Johnson v. Commissioner of Social Security* for the proposition that a piece of evidence can be implicitly rejected without explanation where "overwhelming evidence in the record discounted its probative value." 529 F.3d 198, 204 (3d Cir. 2008). The Commissioner has not shown, however, that Dr. Lawler's report was so lacking in probative value or overwhelmed by contrary evidence that it could be disregarded without comment.

### B. Listing 11.02B

Plaintiff argues that claimant should have been found disabled at Step Three of the sequential evaluation, because the record establishes that she met the criteria of listing 11.02B on and before March 31, 2010. To satisfy a listing, a claimant must show that all of the criteria for a listing have been met. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004). "An impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530. The Commissioner's Listing of Impairments provides that a claimant whose impairment meets or equals the following criteria is disabled:

> [C]onvulsive epilepsy, (grand mal or psychomotor) ... occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With ... [n]octurnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02B.

The ALJ's decision states that claimant's seizures did not meet the criteria of listing 11.02 because: (i) "she did not have convulsive epilepsy occurring more frequently than once a month in spite of three months of prescribed treatment" (Tr. 18); and (ii) her seizures were "not complex partial seizures as required by listing 11.02B." (Tr. 20)

Plaintiff submits that the ALJ committed a mistake of fact because the record shows that claimant had convulsive nocturnal seizures one or more times a month before the date of last insured. (D.I. 9 at 5-6; *see also* Tr. 940 (one or two generalized tonic-clonic seizures a month around August 2008); Tr. 396 (one to two seizures per month around January 2009); Tr. 951 (between 2 and 3.5 seizures per month around April 2009); Tr. 474 (average frequency of seizures for period before March 31, 2010

12

was 2 to 3 times per month). Because the ALJ's decision appears to be inconsistent with the facts in the record, the court must remand so that the ALJ may consider whether claimant's seizures met or equaled all of the criteria set forth in listing 11.02B in light of the evidence that she experienced seizures between 1 to 3.5 times per month before March 31, 2010.

Plaintiff also submits that the ALJ's decision committed an error of law because, as he correctly notes, listing 11.02B does not specify that the seizures must be "complex partial seizures." Instead, listing 11.02B requires seizures that are "grand mal or psychomotor." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02. It appears that complex partial seizures are not the same as grand mal seizures. *Compare* Stedman's Medical Dictionary, p. 1744 (28th Ed. 2006) (defining "complex partial" as seizures "with impairment of consciousness, occurring in a patient with focal epilepsy) and *id.* (defining "grand mal" seizures as "characterized by the sudden onset of tonic contraction of the muscles...."); *see also Flanery v. Chater*, 112 F.3d 346, 348 (8th Cir. 1997) (testimony of doctor stating that patient suffers from partial complex seizures and occasional grand mal seizures); *Easthouse v. Shalala*, 877 F. Supp. 561, 564 (D. Kan. 1995) (medical testimony that the patient was having a number of seizures, "most partial complex, a few grand mal").

In addition, the court notes that "grand mal" seizures is synonymous with "generalized tonic-clonic" seizures, of which there is some evidence in the record. *See* Stedman's Medical Dictionary, p. 1744 (28th Ed. 2006) and (Tr. 940). Accordingly, the court remands so that the ALJ may consider whether there is sufficient evidence that claimant had the type of seizures at the frequency required by listing 11.02B. If the fact

that the seizures were not complex partial seizures is relevant to the analysis, the ALJ did not identify the evidence on which she relied to make that conclusion, and should do so on remand.

Finally, the Commissioner argues that claimant's nocturnal seizures did not meet listing 11.02B, because there was no evidence that the seizures "manifested in residuals that **significantly** interfered with her daytime activity," as required by the listing. (D.I. 11 at 9 (emphasis in original)) Although significant interference is a requirement of listing 11.02B, the ALJ did not base her conclusion on that requirement.[2] Accordingly, she will have to weigh the evidence on that issue on remand.

### C.     Medical Opinion of the Treating Physician Dr. Schmitt

Plaintiff submits that the ALJ erred as a matter of law by rejecting the medical opinion of claimant's treating physician, Dr. Schmitt, without explanation. (D.I. 9 at 7-10) If a treating physician's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight. 20 C.F.R. §404.1427(d)(2). If a treating physician's opinion is not given controlling weight, the ALJ must explain her reasons for not doing so. 20 C.F.R. § 404.1527(c)(2).

Dr. Schmitt opined that claimant was capable of low stress jobs, but would be absent from work about three times a month due to her impairments. (Tr. 478) The

---

[2] The ALJ's decision states that claimant's nocturnal episodes "manifested residuals, which interfered significantly with her activities during the day." (Tr. 18). It is unclear whether this was an argument by claimant's counsel not clearly attributed to him or the conclusion of the ALJ that contradicts the Commissioner's arguments before the court.

ALJ's conclusion that claimant had the residual functional capacity to perform past relevant work, rested, in part, on Dr. Schmitt's opinion that claimant was "capable of a low stress job." (Tr. 20) But the ALJ's decision is otherwise silent as to what weight, if any, she gave to Dr. Schmitt's opinion.

The Commissioner argues that Dr. Schmitt's opinion may be "entitled to no significant weight" because it is not clear that the opinion addressed claimant's capacity before the date of last insured. (D.I. 11 at 9-10) However, that explanation is not indicated in the ALJ's decision. If the ALJ did not give the treating physician's opinion controlling weight, she was obligated to explain her decision. 20 C.F.R. § 404.1527(e)(2)(ii); *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 435 (3d Cir. 1999) ("Where competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence." (internal citation omitted)).

### D. Credibly Established Limitations

Finally, plaintiff argues that, if the ALJ should have given any weight to Dr. Schmitt's or Dr. Lawler's opinions, then the ALJ's hypothetical questions posed to the VE failed to include all of claimant's credibly established limitations. (D.I. 9 at 10-12) A hypothetical question presented to a VE must include all of a claimant's impairments which are supported by the record. A hypothetical question which omits credibly established limitations is defective and the answer thereto cannot constitute substantial evidence to support denial of a claim. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

If the ALJ determines on remand that some weight should have been given to the opinions of Dr. Schmitt or the findings of Dr. Lawler, then the ALJ will have to seek testimony from a VE regarding any credibly established limitations not previously posed to the vocational expert. For example, Dr. Schmitt opined that claimant would be absent about three times per month, and this limitation was not previously presented to the VE. If that portion of Dr. Schmitt's opinion was credibly established, then that hypothetical limitation should be presented to a VE.

Similarly, the ALJ's previous hypothetical questions included difficulty with short and long term memory for less than one-third of the day and difficulty with concentration, persistence, and pace for two-hour periods. If the ALJ finds that Dr. Lawler credibly established that claimant had "several weaknesses" in memory recall, language functioning, and cognitive functioning, then the ALJ will have to consider whether those limitations were sufficiently represented in the previous hypothetical questions.

## V. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is denied. This matter is remanded for further administrative proceedings consistent with this opinion. An appropriate order shall issue.